NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

MEGAN E.,
*Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, H.E.,
*Appellees*.

No. 1 CA-JV 18-0466
FILED 6-13-2019

Appeal from the Superior Court in Maricopa County
No. JD34479
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Kent E. Cattani joined.

---

**J O H N S E N**, Judge:

**¶1**          Megan E. ("Mother") appeals the superior court order severing her parental rights to her son ("Child"), who was born in March 2014. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**          Mother, who was born in 1993, began using heroin at age 15. She testified in these proceedings that she used heroin daily until 2010, when she began taking Suboxone without a prescription.[1] According to other accounts she gave, she did not switch to Suboxone from heroin until 2012 or 2013. Mother eventually developed a volatile relationship with Child's father.

**¶3**          The Department of Child Safety ("DCS") took Child into custody in June 2017 and filed a dependency petition alleging Mother was unable to parent due to substance abuse and mental health issues.[2] The superior court found Child dependent as to Mother in September 2017.

---

[1]      Suboxone is a prescription drug approved by the Food and Drug Administration for treatment of people with opioid-use disorders. It produces effects such as euphoria or respiratory depression, but at much lower and safer levels than produced by opioids. It is prescribed to reduce withdrawal symptoms and cravings associated with opioids, but has its own side effects, including cravings, inability to sleep, distress and irritability. Because of its opioid-like effects, it can be misused and can lead to dependence. *See Buprenorphine*, Substance Abuse and Mental Health Services Administration (May 7, 2019), https://www.samhsa.gov/medication-assisted-treatment/treatment/buprenorphine.

[2]      DCS also filed a dependency petition against Child's father, but his parental rights are not at issue in this appeal.

**¶4** The court adopted a case plan of reunification, and DCS offered Mother case management, a psychological evaluation, substance-abuse assessment and treatment, drug testing, and supervised visitation. Mother completed a substance-abuse assessment with TERROS in July 2017, where an evaluator recommended that she complete a medically supervised detoxification, then participate in intensive outpatient treatment.

**¶5** Mother did not follow the TERROS recommendations, but instead sought services from Community Bridges, Inc., ("CBI"), where she presented with symptoms of substance abuse that included homelessness and inability to fulfill home and work obligations. Mother reported to CBI that she had been buying Suboxone "off the streets," and CBI diagnosed her with opioid-use disorder. She agreed to a treatment plan that included a psychological evaluation, medically managed Suboxone treatments, nursing services, drug and alcohol screening, intensive outpatient therapy, case management, peer support services, and individual counseling. As part of her Suboxone treatment program, Mother signed a patient agreement affirming that she understood the program would be a "detoxification program rather than a maintenance program, and is designed to appropriately wean me off of all prescribed and illicit substances."

**¶6** Through CBI, Mother received prescriptions for Suboxone for most of July 2017 through September 2018. At the start of her treatment in July 2017, CBI prescribed her 2 mg of Suboxone per day. In September 2017, she told CBI that she was not then "ready to detox," and by early October 2017, her dosage had increased to 4 mg and then to 8 mg per day by the end of October. According to a treatment note dated November 22, 2017, CBI "[d]iscussed a taper schedule over the next two months" with Mother. Further: "Patient is aware of risk of being on Suboxone as well as the risk of dependence and addiction." In December 2017, Mother reported to CBI that her health insurance had lapsed and she was no longer able to pay for her Suboxone prescriptions. In January 2018, she reported to CBI that she had been buying Suboxone off the street. She also reportedly told CBI she had used heroin as recently as August 2017 and that she had spent a lot of time craving opioids, which interfered with her work and home obligations. Mother resumed her prescription Suboxone treatment through CBI later in January 2018, at which point her dosage was 8 mg. As of March 2018, her dosage had increased to 12 mg, but Mother expressed a willingness to decrease her dosage because a prior problem with tooth pain had subsided. In May 2018, when her dosage was 10 mg, a medical provider discussed with Mother a "taper schedule" as well as the risk of dependence and

addiction associated with being on Suboxone, but as of September 2018, Mother's dosage remained at 10 mg.

¶7         As part of her CBI program, Mother was supposed to attend intensive outpatient therapy three times per week. Although she generally complied with therapy attendance requirements, she attended only one session in July 2017, three sessions in November 2017 and three sessions in December 2017. Ultimately, however, Mother successfully graduated from CBI's intensive outpatient substance-abuse program. She then began a standard program of outpatient therapy that met once a week, but she missed many of the sessions – for example, she attended just once in March and once in April 2018. In the meantime, Mother struggled to find stable housing and remained homeless for an extended period during the dependency.

¶8         In June 2018, the superior court granted DCS's request to change the case plan to severance and adoption, and DCS moved to sever Mother's parental rights.

¶9         At the severance hearing, the court heard testimony from Mother, the DCS specialist and Mother's counselor. Mother testified she was currently receiving Suboxone through CBI and that it had been six months since she last bought the medication off the street. Although CBI records contained a report that Mother had said she last used heroin in August 2017, Mother testified she had not used heroin for seven or eight years. She admitted that TERROS recommended that she undergo detoxification from Suboxone, but testified she did not need to do so.

¶10         The DCS specialist testified that Mother behaves appropriately during her visits with Child and that Child had lived with his maternal grandfather since the beginning of the dependency. The DCS specialist testified the grandfather can meet Child's needs and was willing to adopt him. She also testified the grandfather would agree to continue to supervise contact between Mother and Child.

¶11         The superior court granted DCS's motion, severing Mother's parental rights under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(3) (2019) (prolonged drug abuse) and -533(B)(8)(c) (15 months' time in care).[3] Mother timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235(A) (2019),

---

[3]         Absent material revision after the relevant date, we cite the current version of a statute or rule.

12-120.21(A)(1) (2019), -2101(A)(1) (2019) and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

**¶12**      The right to custody of one's child is fundamental but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000).  The superior court may terminate a parent-child relationship upon clear and convincing evidence of at least one of the statutory grounds set out in § 8-533(B).  *Michael J.*, 196 Ariz. at 249, ¶ 12.  Additionally, the court must find by a preponderance of the evidence that termination is in the child's best interests.  *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). "Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept [that] court's findings of fact if reasonable evidence and inferences support them, and will affirm a severance order unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016).

**¶13**      Under § 8-533(B)(3), termination of parental rights may be ordered when "the parent is unable to discharge parental responsibilities because of . . . a history of chronic abuse of . . . controlled substances . . . and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period."  DCS also must show that it made "reasonable efforts to reunify the family or that such efforts would have been futile." *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005).  "Chronic" substance abuse is long lasting, but not necessarily continuous. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 16 (App. 2010).  Temporary abstinence from a controlled substance does not generally outweigh a parent's "significant history of abuse" or "consistent inability to abstain during [the] case," and "a child's interest in permanency must prevail over a parent's uncertain battle with" substance abuse. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016) (quotation omitted).

**¶14**      Mother does not challenge the superior court's finding that DCS made reasonable efforts to provide her with rehabilitative services. Instead, she contests the court's findings that she is unable to discharge her parental responsibilities because of her substance abuse and that her substance abuse will continue for a prolonged indeterminate period. Specifically, Mother argues the court misunderstood her Suboxone treatment and therefore failed to adequately assess her recovery progress. In making this argument, Mother contends that by the time of the severance hearing, her drug dependency had been in remission for "some time."

¶15 Mother's use of Suboxone was not in remission, however. According to the record before the superior court, Mother's Suboxone treatment was supposed to be part of a "detoxification program rather than a maintenance program," and Mother's medical records included repeated concerns about her prolonged use of the drug. But during her year of intensive treatment, her daily dose of Suboxone increased. In support of her contention about remission, Mother points to treatment protocols that she asserts permit use of Suboxone indefinitely (even over a patient's lifetime) as an effective means of treating opioid addiction and that warn against assessing a patient's recovery progress based merely on Suboxone dosage or length of treatment. Mother, however, did not put these materials before the superior court. *See Conant v. Whitney*, 190 Ariz. 290, 293 (1997) (waiver of argument not raised in superior court). In any event, Mother's argument is effectively a request that this court reweigh the evidence, which we will not do. *See Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

¶16 The record contains substantial evidence supporting the superior court's decision to sever Mother's rights. Mother has a significant history of using heroin and Suboxone. Nevertheless, she refused to undergo detoxification from Suboxone as TERROS recommended. Instead, she engaged in medication-assisted Suboxone treatments off and on for more than a year, even though the treatment was supposed to be temporary and was designed to allow her to taper off all medication.

¶17 At trial, Mother testified that under the CBI program, whether she would taper off Suboxone was "up to" her. She conceded that CBI raised a "taper schedule" with her in July 2018, after about a year of treatment, but asserted that she was not ready to "taper" and did not know when she would be able to do so. Mother also acknowledged having an anger problem and admitted that she did not complete a recommended "domestic violence component" of counseling and that she punched her stepmother during an altercation in January 2017. The record shows that in a counseling session, she reported experiencing cravings for opioids and that certain situations triggered her desire to use drugs. She also reported issues with controlling her anger, anxiety and negative emotions, as well as issues with coping with stress. This evidence sufficiently supported the superior court's finding that Mother's continued drug use impaired her ability to parent.

¶18 Mother also argues DCS failed to prove by a preponderance of the evidence that severance was in Child's best interests. Mother points to evidence that she is bonded with Child and that she was engaging in

services. She also argues that severing her rights would not change Child's circumstances because he would continue living with the maternal grandfather, who would permit Child to continue his relationship with Mother.

**¶19** Termination of a parent's rights "is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). One of the factors that may favor termination "is the immediate availability of an adoptive placement." *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377 (App. 1998).

**¶20** The record shows that Mother struggled to find stable housing and remained homeless for an extended period during the dependency. At the time of the severance hearing in November 2018, she was living rent-free in a home owned by her grandparents that contained piles of boxes that created an environment that would not be safe for Child. She reported to CBI in January 2018 that she had craved opioids much of the time and that those cravings interfered with her obligations at work and at home. At the same time, the court found Child was in an adoptive placement that was meeting all his needs and that severance would benefit Child by providing him with permanency and stability. *See Jennifer S.*, 240 Ariz. at 287, ¶ 17.

¶21  The evidence recited above supports the superior court's findings that DCS proved by a preponderance of the evidence that termination is in Child's best interests.

**CONCLUSION**

¶22  The record fully supports the superior court's findings and conclusions. We affirm its order severing Mother's parental rights.[4]



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[4]  Because substantial evidence supports the court's decision to sever Mother's rights under A.R.S. § 8-533(B)(3), we need not address Mother's arguments relating to the 15 months' out-of-home placement ground for severance. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002).